Filed 3/23/23

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

----

| | |
|---|---|
| In re L.J., a Person Coming Under the Juvenile Court Law. | C096775 |
| LASSEN COUNTY HEALTH AND SOCIAL SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.B.,<br><br>Defendant and Appellant. | (Super. Ct. No. 2020-JV0066398, J6529) |

APPEAL from a judgment of the Superior Court of Lassen County, Candace J. Beason, Judge.  (Retired judge of the L.A. Sup. Ct., assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Law Office of Linda J. Conrad, Linda J. Conrad for Defendant and Appellant.

Prentice Long, Margaret E. Long and Scott A. McLeran for Plaintiff and Respondent.

_____

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II of the discussion.

1

Appellant M.B., mother of minor L.J., appeals from the juvenile court's orders terminating parental rights and freeing the minor for adoption. (Welf. & Inst. Code, §§ 366.26, 395.)[1] Mother contends that the juvenile court erred by: (1) denying her request to admit self-made recordings of her visits with the minor to support her argument that the section 366.26, subdivision (c)(1)(B)(i) beneficial parental relationship exception applied and to impeach the evidence of the visits; and (2) finding the beneficial parental relationship exception did not apply to prevent the termination of parental rights.

We will affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I

*Initial Dependency Proceedings*

On February 2, 2020, law enforcement responded to a disturbance at mother's home. The minor's half sibling, B.B., reported that mother and another half sibling, T.B., were in an argument, and mother stomped her feet in the hallway causing a portable shelf to fall and hit the minor. The minor did not have visible injuries. Two days later, law enforcement responded to a 911 call stating that mother was forcing B.B. and T.B. to leave the residence and threatening to have known drug dealers beat them. According to the responding officer, mother was hysterical and appeared to be under the influence. Mother initially denied using illicit substances but then admitted that she used methamphetamine, claiming that she did not use it in front of her children.

On February 7, 2020, Lassen County Health and Social Services Agency (the Department) filed a petition alleging that the minor, then age three years, came within the provision of section 300, subdivision (b)(1), failure to protect, and section 300, subdivision (g), no provision for support. The petition alleged that mother was unable to

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

provide appropriate parental care and supervision for the minor due to her illicit drug use. The petition further alleged that while screaming at her children, mother caused a heavy closet door to fall, nearly striking the minor. At the initial detention hearing, the juvenile court ordered the minor detained.

On February 20, 2020, the Department filed a jurisdiction report, reporting that during a visit, mother gave the minor candy despite being told not to give her candy due to her untreated cavities. This caused the minor to begin crying due to tooth pain. Mother also failed to attend a scheduled phone visit. At the March 9, 2020, contested jurisdiction hearing, the juvenile court found the allegations in the petition true and sustained the petition.

## II

### *Disposition*

The Department's disposition report noted the minor initially became extremely upset when leaving mother at the end of visits, but she quickly began to say goodbye to mother without incident after her successful transition to her placement. During most visits, mother would interact with the minor only minimally and end the visits early. At the dispositional hearing on March 23, 2020, the juvenile court adjudged the minor a dependent, ordered minor removed from mother's physical custody, and ordered reunification services be provided to mother. Mother's case plan consisted of general counseling, a domestic violence/anger management program, a parent education program, and substance abuse treatment.

## III

### *Status Review*

On August 4, 2020, the Department filed a section 388 petition for modification, requesting that mother's reunification services be terminated. The Department alleged mother made no progress in her case plan, engaged minimally in visits with the minor,

refused to work on her case plan, had irrational behaviors, tested positive for methamphetamine, and refused to drug test since May 2020.

The Department's August 31, 2020, status review report showed that mother had called law enforcement claiming that the Department lost the minor and that the minor had been kidnapped and was being held for ransom. It was reported that mother did not attend several scheduled visits. At mother's request, the social worker arranged residential substance abuse treatment, but mother did not follow through. Mother completed intake for a substance abuse treatment program, general counseling, and anger management services; however, mother did not attend any scheduled appointments or services.

In an addendum report, the Department reported that mother had recently attempted suicide and was taken to the hospital. Thereafter, mother announced that she had decided to "do whatever is needed." Around this time, September 2020, mother reported that she had not used illicit substances for 10 days, began anger management, and completed intake for rehabilitation services. Mother began attending community support meetings, found a sponsor, and registered for child endangerment and parenting classes. Nonetheless, the Department did not change its recommendation and request that mother's services be terminated.

At the contested six-month status review hearing on October 26, 2020, the juvenile court found that mother had made significant progress and found good cause to provide an additional six months of reunification services, effectively denying the Department's section 388 petition.

In a December 2020, interim review report, the Department reported that mother had engaged in her case plan and provided negative drug tests. Mother had regular visits with the minor and began overnight visits in January 2021. On March 8, 2021, the juvenile court returned the minor to mother under a plan of family maintenance.

## IV

### *Subsequent Petition*

On May 21, 2021, the Department filed a section 342 subsequent petition under section 300, subdivisions (b) (1) and (c), alleging that on or about May 19, 2021, the minor had been exposed to a violent confrontation between her mother and mother's new husband, J.K., during which they struck and spat on each other while the minor was present, and mother threatened to commit suicide. It was further alleged that this was the second time in approximately one month that the minor was exposed to a violent confrontation between mother and J.K.

The detention report further stated that on May 20, 2021, it received an early morning request to respond to a gas station because mother was fighting with J.K. in a vehicle and the minor was present. By the time the social worker arrived, they were gone. Meanwhile, J.K. went to the Department's office to show a video of the incident, and as the social worker was holding J.K.'s phone, mother sent a text message to J.K. asking him to pick her up because she and the minor were going to leave the area. The social worker directed mother to bring the minor to the Department or a warrant would be filed. J.K. told the social worker that mother was using drugs, and the video he took showed mother possibly hitting and spitting on J.K., preventing him from leaving, and threatening suicide.

When interviewed by the social worker, the minor reported that J.K. hit her with a book, causing a visible bump on her forehead. The minor also reported that she saw J.K. and mother hit each other. Mother subsequently tested positive for methamphetamine. The juvenile court found the minor came within section 300, and the minor was again detained.

In the June 2021, jurisdiction report, the Department reported that mother did not appear for two scheduled visits and during a third visit, mother was erratic and had an outburst in the lobby. It took the social workers much of the visit time just to calm

mother. It was also reported that mother's June 2, 2021, oral swab drug test was positive for methamphetamine. The juvenile court sustained the supplemental petition on July 26, 2021.

## V

### *Subsequent Disposition*

In an August 2021, disposition report, the Department reported that mother had entered a residential substance abuse treatment program. She also made even more serious allegations against J.K., saying he had raped her, and she would be filing a restraining order. The Department personnel observed the minor "enthusiastically greeting [Mother] at the beginning of each in-person visit." The minor's speech was noticeably worse upon re-detention than when she was initially returned to mother's care. The minor also exhibited "signs of anxiety and stress following visits with [mother] and maternal family members." Since re-detention, mother had participated in 20 scheduled visits and missed three scheduled visits. The social worker was concerned that mother discussed adult issues with the young minor during her visits, causing the minor stress and anxiety. In an addendum report, the Department reported that mother left the residential program without explanation. Mother was still in a relationship with J.K. and wanted reunification services for him.

At the September 20, 2021, contested disposition hearing, the juvenile court found clear and convincing evidence that reunification was not going to occur, and it was not in the minor's best interests to extend reunification services. The court terminated reunification services and set a selection and implementation hearing pursuant to section 366.26.

## VI

### *Section 366.26 Hearing*

In the December 30, 2021, section 366.26 report, the Department reported that the care providers wanted to adopt the minor and had been found to be suitable adoptive

parents. Mother had three visits with the minor since the last hearing, and the social worker reported mother behaved inappropriately at each visit and had to be redirected numerous times. The minor had significant behavioral issues following two of the three visits with mother.

In a May 2022, addendum report, the Department provided additional information regarding the nature of the relationship between mother and the minor in order to address the beneficial parental relationship exception to termination of parental rights. The Department conceded that mother met the first element of regular visitation and contact, despite having missed several visits.

Regarding the second element, the Department opined mother had not shown a beneficial relationship because of a series of problems over the past 26 months: the minor had resided with mother for only 72 days; the quality of mother's visitation with the minor was generally poor; mother "seemed focused on meeting her own needs rather than attending to [the minor's] needs and interests"; mother's interactions with the minor caused the child to cry and become dysregulated during seven visits, including during each of the most recent visits since reunification services were terminated; mother chastised the minor when she referred to her caregiver as "mommy," upsetting the minor; and mother lacked understanding of the damage it could cause the minor by her insistence the minor embrace mother's abuser as family.

After supervised visits, the minor "reportedly expressed guilt, screamed and threw tantrums." Further, "upon return to the resource family home [the minor] appeared uncomfortable talking about [mother]," referring to her as " 'her' " or by mother's given name. After visits, the minor sought reassurance from the care providers that she would remain safe.

Regarding the third element, whether termination of parental rights would be detrimental to the minor, the Department reported that the minor was "stable, comfortable, and happy when not in [mother's] presence." The minor had not

experienced distress from being separated from mother. Mother demonstrated "untreated, unstable mental health and exposure to domestic violence." The Department believed that termination of parental rights would alleviate the stress for the minor related to visits with mother and allow her to become fully integrated into her new family.

According to the attached adoption assessment, the assessor concluded that it was not in the minor's best interest to order guardianship, and any benefit to the minor of continuing the legal relationship with mother was outweighed by the benefit of legal permanence through adoption.

On June 2, 2022, the juvenile court appointed special advocate (CASA) reported that according to the minor's therapist, the minor was suppressing her trauma. The CASA reported that the minor suffered from "chaotic and confrontational visits with her mother." Mother would break visitation rules and bring gifts for the minor "only for [the minor] to have to return the items at the end of the visit, as they are not allowed." Returning the gifts caused the minor "great distress," and mother would become confrontational and blame the social worker.

Clinical Psychologist, J. Reid McKellar, conducted a bonding evaluation and reported that on several occasions, as noted in the visitation records, mother engaged in prolonged verbal disagreements with the social workers during visits, causing the minor to exhibit visible signs of distress, during which mother did not disengage. Dr. McKellar reported that mother brought half sibling T.B. to the bonding evaluation despite being admonished not to do so because Dr. McKellar was tasked with evaluating only the bond between mother and the minor. He observed that mother's demeanor with the minor was "more like a playful aunt than a primary care provider." In addition to finding that severance of the bond between mother and the minor would not have a detrimental impact on the minor, Dr. McKellar also opined that the minor's relationship with mother is not beneficial for the minor "within the context of the case plan status and [*In re*] *Caden C*. [(2021) 11 Cal.5th 614, 629 (*Caden C*.).]" He opined that if the minor were to

8

be placed in a guardianship, mother's "behavior would undoubtedly undermine the stability of [the minor's] placement." At the request of mother's counsel, Dr. McKellar subsequently reviewed additional materials provided by mother, including audio/video recordings she had taken during several visits with the minor. He noted that the interactions on the recordings were consistent with his prior observations and did not change his opinion that while there was a bond between the minor and mother, severance of that bond would not be detrimental to the minor.

At the contested section 366.26 hearing, which began on July 28, 2022, the juvenile court heard testimony from the maternal grandmother, T.B., mother, and the social worker. The maternal grandmother testified that she observed two or three visits between mother and the minor, and she never saw the minor upset by these visits. She testified that the minor appeared sad when the visits ended. T.B. testified that during the bonding evaluation, he saw that the minor and mother were happy to see each other and as the visit was ending, the minor "started crying to not leave." Mother testified that the minor was not distressed during visits and denied doing anything inappropriate. Mother testified that she was unaware that it was against the law or rules for her to make audio/visual recordings of just herself and the minor during visits. She claimed the minor knew she was being recorded.

The social worker testified that the social worker would sit outside the visitation room during mother's visits with the minor because the social worker noticed that mother tended to engage more with her than with the minor if the social worker was in the room. The social worker also testified that there was a sign posted in the lobby that visits were not to be recorded, and she did not recall any of the social workers that supervised the visits consenting to mother recording the visits. To her knowledge, the minor had not requested more visits.

At the conclusion of testimony, mother's counsel sought to introduce the audio/video recordings taken by mother during her visits with the minor on January 19,

9

2022, February 25, 2022, and March 31, 2022, for the purpose of the juvenile court observing their interactions. The minor's counsel contended that the audio/video recordings were not admissible if not authorized by both parties, and that on behalf of the minor, he was not consenting to their introduction on grounds that the minor did not provide affirmative permission. The Department's counsel also objected to the introduction of the audio/video recordings on grounds that they were not authorized and were taken in violation of the Penal Code, and would also be cumulative since Dr. McKellar had reviewed the recordings in forming his opinion for the bonding evaluation. The juvenile court sustained the objections, stating that it was a misdemeanor to record something without the consent/agreement of the other party, and the recordings were thus inadmissible as evidence. The court found that because the minor was a ward of the court, mother could not consent to the recordings on the minor's behalf. The court further noted that Dr. McKellar had reviewed the audio/video recordings and they did not change his opinion that it would not be detrimental to have parental rights terminated.

The juvenile court found that there was clear and convincing evidence the minor was likely to be adopted, none of the exceptions to adoption existed, termination of parental rights would not be detrimental to the minor, and it was in the best interest of the minor to terminate parental rights. Regarding the parent-child exception, the juvenile court stated: "The Court does find that the mother has not met her burden by a preponderance of the evidence standard, that it would be detrimental to [the minor] to have parental rights terminated. And while she does have the bond with mother, grandmother and siblings, . . . the focus is on [the minor]." The court noted that the minor had been removed twice and was not in mother's care or custody for a significant period of time. The court further noted that Dr. McKellar's report indicated that while there was a bond, it was closer to a relative-child bond. The juvenile court ordered parental rights terminated and freed the minor for adoption.

Mother filed a timely notice of appeal.

10

DISCUSSION

I

*Request to Admit Audio/Video Recordings*

Mother contends that the juvenile court violated her constitutional right to due process by excluding the audio/video recording she made of herself with the minor. She claims she was prejudiced because the court's refusal to admit this evidence prevented her from meeting her burden of showing that the beneficial relationship exception applies. We disagree.

Section 706 provides the court shall receive in evidence the social study of the children and such other relevant and material evidence as may be offered. "[T]he provisions of Evidence Code section 352 (allowing the court to limit relevant evidence if it is cumulative, time wasting, or likely to confuse the issues) are necessarily implied in Welfare and Institutions Code section 706." (*In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1843, fn. omitted.) "Trial courts are afforded discretion to work within existing guidelines to determine the admissibility of evidence. [Citation.] The reviewing court will not disturb their findings absent an ' " ' "arbitrary, capricious, or patently absurd determination." ' " ' [Citation.]" (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1176.)

Here, the juvenile court found mother's recordings inadmissible, reasoning that because the minor was a ward of the court, mother could not consent to the recordings on the minor's behalf. Accordingly, the court noted that it was a misdemeanor violation to record something that the other party does not agree to, and the recordings were thus inadmissible as evidence. The court excluded the evidence on these bases. The court also noted that Dr. McKellar had reviewed the audio/video recordings, and they did not change his opinion that it would not be detrimental to have parental rights terminated.

Penal Code section 632 expressly forbids the recording of confidential communications without the consent of all parties *and* makes such recordings inadmissible "in any judicial, administrative, or other proceeding." For the purposes of

11

Penal Code section 632, a confidential communication "means any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive, or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." (Pen. Code, § 632, subd. (c), partially abrogated as to criminal proceedings, as stated in *People v. Guzman* (2019) 8 Cal.5th 673, 679-684.)

Here, mother contends she was able to consent to the recordings on the minor's behalf. She is incorrect. In dependency proceedings, the child's appointed counsel serves as his or her guardian ad litem. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 910.) In such a role, the "guardian ad litem is responsible for both evaluating the 'situation and needs of the child' and 'mak[ing] recommendations to the court concerning the best interests of the child.' [Citation.] The guardian ad litem is required to ' "represent and protect the rights and best interests of the child." [Citation.]' " (*Id.* at pp. 910-911.) There is no indication that minor's appointed counsel was informed about these recordings prior to the time when mother attempted to introduce them into evidence. Further, the minor's counsel denied any consent and objected to their introduction.

Mother further argues that there is no statutory provision limiting a parent's right to consent to video recording her child. She misunderstands the law of juvenile dependency. Here, the minor had been removed from her custody and care, was adjudged a dependent child of the court, and was appointed counsel to act on her behalf. While the statutory scheme for child dependency is silent as to whether a parent or the minor's counsel may consent to recording a minor, it does address the matter of consent as to other sensitive matters affecting the minor's rights, and most particularly, the minor's privacy rights and privileges. For example, the statutory scheme expressly provides that the minor's counsel shall be the holder of the psychotherapist-client

privilege, physician-patient privilege, and clergyman-penitent privilege, and that counsel may invoke these privileges on the minor's behalf if the child is found by the court not to be of sufficient age and maturity to consent. (§ 317, subd. (f).) The statute includes a rebuttable presumption that the child is of sufficient age and maturity to consent if the child is over 12 years of age. (*Ibid.*) Because the parents' interests in dependency proceedings are frequently in direct conflict with the minors' interests and a recording made by a parent may be selectively taken to benefit only the parent's interests, we are persuaded that minor's counsel, as the guardian ad litem, must likewise consent to a recording on behalf a minor, at least for those minors not of sufficient age and maturity to consent to such a recording on their own.[2]

Mother next contends that "where, as here, the visits were being supervised by the [D]epartment and a social worker was stationed right outside the door, and everyone including minor's counsel knew the visits were supervised, there is, as a matter of law, no objectively reasonable expectation of privacy." This contention also lacks merit. Here, the record shows the visits were held in a private visitation room, not open or subject to public view or setting, with a social worker sitting outside the door. Indeed, there is a *sign*, *posted in the lobby*, expressly stating that visits were not to be recorded, rendering it unequivocally reasonable for any participant to expect the visit would *not* be recorded. Moreover, mother essentially admitted the visits were private, as she testified that she "was not aware that it was against the law if it was just [the minor] and [herself] that were being recorded" and she made the recordings because "there was no one to witness" the visits because only the minor and herself were present. Accordingly, these visits qualified as confidential communications between mother and the minor.

---

[2]     We do not opine on whether and under what conditions an older minor may consent to recordings.

13

Even absent authority under Penal Code section 632 to exclude the audio/video recordings, the juvenile court had broad authority to determine the admissibility of this evidence. (See *In re Cole, supra*, 174 Cal.App.4th at p. 911 [a juvenile court's ruling on the admissibility of evidence will only be disturbed if there is a clear showing of an abuse of discretion].) Without any apparent judicial order or authorization, mother's counsel provided the recordings to Dr. McKellar. We question the propriety of counsel's actions in this regard but, in any event, note that as the juvenile court observed, Dr. McKellar reviewed the recordings, which he concluded were consistent with his own observations and did not change his opinion that it would not be detrimental to terminate parental rights.

Mother asserts that the juvenile court's ruling that the recordings were not admissible prevented her from being able to present a complete defense and violated her due process rights. Due process during a dependency hearing generally requires that parents be given the right to present evidence, to cross-examine adversarial witnesses, and for counsel to be provided the opportunity to argue the merits of an issue. (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 914-915.) "The due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court. [Citations.]" (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 817.) Mother's counsel had the opportunity to, and did, cross-examine the social worker at the hearing. Audio/video recordings of visits at which the social worker was not present lacked impeachment value as to the social worker's testimony. Mother also introduced Dr. McKellar's report, who observed and discussed the recordings and noted they were consistent with his observations. Mother also had the opportunity during her testimony to describe the visits depicted on the recordings from her personal recollection. Accordingly, mother was not precluded from presenting her case. The recordings were cumulative of other evidence before the juvenile court, and the court acted well within its discretion to exclude them.

14

Even if mother's due process rights had been violated, which we conclude they were not, mother cannot demonstrate prejudice here. Mother was given a full and fair opportunity to be heard on the matter of visits and bonding, to confront and cross-examine witnesses, and to testify at the hearing. Mother's claim that her selective recordings during three visits would have shown her relationship with the minor in a more favorable light is inconsistent with the overwhelming weight of the evidence. Nor could they have established that individuals who were not present were lying about what went on during the visits. In view of the extensive documentation of mother's problematic visits with the minor, the numerous reports in the record, Dr. McKellar's report, and the testimony of the social worker and mother at the hearing, we conclude that even if it was an error to exclude the recordings, it was harmless beyond a reasonable doubt. (*In re Vanessa M.* (2006) 138 Cal.App.4th 1121, 1132 [constitutional due process violation in dependency context requires application of the harmless beyond a reasonable doubt standard because an error is of federal constitutional dimension].)

II

*Beneficial Parental Relationship Exception*

Mother contends the juvenile court erred in failing to find the beneficial parental relationship exception to adoption. She argues that the juvenile court's analysis was terse and did not sufficiently state its considerations and findings on the record. She also argues that the juvenile court erred in applying improper factors under *Caden C., supra*, 11 Cal.5th at page 629. We disagree.

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption*. [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances that permit the court

15

to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One such circumstance is the so-called beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i) [beneficial parental relationship exception]; *Caden C., supra*, 11 Cal.5th at p. 629.)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to the termination of parental rights. (*Caden C., supra*, 11 Cal.5th at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).) The parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent — the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, at p. 636.)

The beneficial parental relationship exception to adoption "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The factual predicates of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*Caden C., supra*, 11 Cal.5th at pp. 639-640.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Id.* at pp. 640-641.)

Here, the Department concedes, as it did in the juvenile court, that mother met the first element of regular visitation and contact. As for the second and third elements, the juvenile court concluded that while there was a bond between the minor and mother, the

focus is on the minor, and mother did not meet her burden to establish that termination of that attachment would be detrimental to the minor. The court noted the fact that the minor had twice been removed from mother, the substantial length of time that the minor had been in foster care, and that the bonding evaluation report by Dr. McKellar indicated that while there was a bond between mother and the minor, it was not a bond "of a significant strength to be an example of a mother-child bond but of a relative-child bond." As such, it appears the court found mother's evidence of two of the required elements to establish the beneficial parental relationship exception was lacking. (*Caden C., supra*, 11 Cal.5th at pp. 631, 636.)

Mother further contends that the juvenile court improperly found that minor's bond with mother was not that of a mother-child, but more of a relative-child bond. Mother incorrectly attributes this finding to the juvenile court; the court merely recited Dr. McKellar's findings in his bonding evaluation report. Moreover, Dr. McKellar's observation of the nature of the bond is supported by the fact that the minor referred to mother as " 'her' " or by her given name.

The *juvenile court* found that mother did not meet her burden to establish either that the minor had "a substantial, positive, emotional attachment" to her, or that termination of that attachment would be detrimental to the minor (*Caden C., supra*, 11 Cal.5th at p. 636). Mother offered nothing more than conclusory statements that there was a bond that should not be severed. Conversely, the Department provided the court with sufficient evidence, including reports and visitation logs, to determine the minor did not have the kind of relationship with mother that would trigger the beneficial parental relationship exception. Dr. McKellar's bonding evaluation report requested by mother reached the same conclusion.

The minor's anxiety and behavioral issues following visits with mother were well-documented. From the outset of visitation and throughout the case, mother would often miss visits and when she did visit the minor, interacted with her only minimally and

ended the visits early. The minor exhibited "signs of anxiety and stress following visits with [mother]." CASA reported that the minor suffered from "chaotic and confrontational visits with her mother." Mother was so frequently confrontational and overly engaged with the social workers, instead of the minor, during visits that the social workers began sitting outside the visitation room door.

At the time of the hearing, the child was only six years old. Her first three years in the care of the mother had been traumatic. By all accounts, the child was now in a safe and secure permanent placement, where over several years she had developed a healthy bond with her caregivers who were ready to adopt her. The mother's contact with the child was nothing more than one visit per month, with no prospects to increase in frequency, and the evidence established that the visits were nothing more than playdates, at best. In sum, when focusing on the well-being of the child, the negatives of continuing the relationship — particularly, the child's ongoing anxiety — far outweighed any positives.

Accordingly, we conclude that the juvenile court's findings are supported by substantial evidence in the record and the court did not abuse its discretion in finding no detriment to termination of parental rights.

Finally, to the extent mother complains that the juvenile court failed to state, on the record, its reasoning and findings in denying the application of the beneficial parental relationship exception, the court is not required to make those findings on the record. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156, 1161 [no requirement that the juvenile court makes specific findings when it finds beneficial parental relationship exception does not apply].) The juvenile court did not err in finding the beneficial parental relationship exception did not apply.

## DISPOSITION

The orders of the juvenile court, terminating parental rights and freeing the child for adoption, are affirmed.

_____\s_____,
McADAM, J.*

We concur:

_____\s_____,
ROBIE, Acting P. J.

_____\s_____,
MAURO, J.

---

*       Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19